Tarum Law Office P.C.
Randy L. Tarum
417 Central Avenue, Ste. 401
Great Falls MT 59401
Telephone (406) 268-0001
State Bar I.D. # 4548
e-mail: randy@tarumlaw.com

Attorney for Plaintiffs

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MONTANA

| | |
|---|---|
| In Re )<br>SHOOT THE MOON, LLC )<br>)<br>Debtor. )<br>)<br>JERRY HALL and JAN HALL, )<br>)<br>Plaintiffs. )<br>)<br>v. )<br>)<br>FIRST INTERSTATE BANK, a )<br>Montana banking corporation and )<br>DOES 1-10, Defendants. ) | Case No. 2:15-bk-60979-WLH<br><br><br><br>Adv. Proceeding No.2:22-ap-02009-WLH |

**PLAINTIFF'S RESPONSE BRIEF TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

COMES NOW Plaintiffs, JERRY HALL and JAN HALL (HALLS), through counsel, Randy Tarum and respectfully submit the following brief in opposition to Defendant FIB's Motion for Summary Judgment and in support of their position that the 2016 release does not encompass Plaintiff's claims and does not bar Plaintiff's claims against Defendant FIB.

FIB incorrectly asserts that Plaintiffs' claims are barred because they are derivative of the claims released by the Trustee in the STM bankruptcy. The claims in Plaintiffs' Amended

Page 1 of 19

2:22-ap-02009-WLH    Doc#: 36    Filed: 02/21/23    Page 1 of 19

Complaint are not derivative because 1) Under the Wagoner Rule, where STM through Hatzenbeller (the bankrupt estate) joined with FIB to defraud the HALLS, the Trustee cannot recover against FIB based upon *in pari delicto* and therefore lacked standing; 2) Plaintiffs' claims are not derivative as they are the result of particularized injures that not directly related to the injuries to STM. Evidence of distinct injuries and unrelated damages are found in the allegation in Amended Complaint and supported by the Affidavit of Jerry Hall and the admissions of FIB.

**1. Facts in support of the HALLS' Opposition to Motion for Summary Judgment.**

On August 16, 2022 the HALLS filed an Amended Complaint. The HALLS Amended Complaint asserts state law claims against FIB including Counts (3) Civil and Criminal Conspiracy; (4) Negligence-Professional Negligence-Banking Malpractice; (5) Aiding and Abetting Fraud; (6) Unjust Enrichment; (7) Breach of the Implied Covenant of Good Faith and Fair Dealing. The Amended Complaint is the live complaint and is substantially different from the to the HALLS' original Complaint. See Affidavit of Jerry Hall.

The HALLS provided loans totaling $1,100,000 to Hatzenbeller through Shoot the Moon III, LLC.
    a.    October 18, 2013 loan of $100,000;
    b.    December 26, 2013 loan of $25,000;
    c.    March 14, loan of $50,000;
    d.    April 4, 2014 loan of $100,000;
    e.    June 4, 2014 loan of $50,000;
    f.    July 24, 2014 loan of $50,000;
    g.    September 12, 2014 loan of $50,000;
    h.    November 7, 2014 loan of $50,000;
    i.    January 16, 2015 loan of $75,000;
    j.    January 29, 2015 loan of $150,000;
    k.    February 21, 2015 loan of $50,000;
    l.    March 13, 2015 loan of $50,000;
    m.    April 17, 2015 loan of $50,000;
    n.    May 15, 2015 loan of $50,000;
    o.    June 26, 2015 loan of $50,000;
    p.    July 24, 2015 loan of $50,000;
    q.    September 4, 2015 loan of $50,000;

r.      September 17, 2015 loan of $50,000;

See Affidavit of Jerry Hall. The HALLS checks to Hatzenbeller's Shoot the Moon were all deposited at Prairie Mountain Bank. See Affidavit of Jerry Hall. Ken Hatzenbeller used his relationship with co-conspirators FIB and Prairie Mountain Bank as an assurance to the HALLS that their investments were safe. See Affidavit of Jerry Hall.

FIB had taken notice of the frequency of large checks being drawn on Prairie Mountain Bank, along with other financial institutions, to cover negative balances on accounts held at FIB. See Affidavit of Jerry Hall and Exhibit 1 to the Amended Complaint. FIB knew of Hatzenbeller's check kiting scheme as early as 2010. See Affidavit of Jerry Hall and Exhibit 1 to the Amended Complaint.

FIB first raised concerns with Hatzenbeller about NSF checks in an August 23, 2010 email. Admitted by FIB in its Answer to Amended Complaint ¶ 15. On August 23, 2010, Bill Weber ("Weber"), President of FIB's Great Falls main branch, knew that Hatzenbeller was writing large NSF checks and depositing them at FIB. On August 23, 2010, Bill Weber ("Weber"), President of FIB's Great Falls main branch, wrote to Hatzenbeller in relevant part:

> Ken, as you are aware, a check you deposited in the amount of $25,000 drawn on US Bank was returned NSF today. This is why our bank has been concerned with deposits you make with checks drawn on PMI Bank. We have discussed the issues that arise when you write checks between various financial institutions and deposit into your accounts with First Interstate Bank and as well as the reverse. Because of this we are now required to have guaranteed funds when depositing a check drawn on another financial institution from Shoot the Moon.

See Affidavit of Jerry Hall and Exhibit 1 to the Amended Complaint. Despite this Knowledge, FIB continued to allow the check kiting scheme to continue for years without taking any action to stop it. See Affidavit of Jerry Hall and Exhibits 1-12 to the Amended Complaint.

On August 2, 2011, in response to concerns about Hatzenbeller depositing checks from Prairie Mountain Bank with FIB that were NSF, FIB entered into an agreement with Prairie Mountain Bank whereby Prairie Mountain Bank would guarantee up to $200,000.00 per day in funds drawn on STM accounts held at Prairie Mountain Bank and deposited at FIB. See Affidavit of Jerry Hall and Exhibit 12 to the Amended Complaint. FIB received numerous deposits from several of Hatzenbeller's Shoot the Moon entities that had accounts at Prairie Mountain Bank. See Affidavit of Jerry Hall and Exhibit 12 to the Amended Complaint.

On May 10, 2012, Ted Lewis ("Lewis"), FIB's Vice President of Commercial Lending for Great Falls discussed how Hatzenbeller may reduce the float involving large checks from Prairie Mountain Bank. See Affidavit of Jerry Hall and Exhibit 2 to the Amended Complaint. On May 10, 2012, Ted Lewis ("Lewis"), FIB's Vice President of Commercial Lending for Great Falls, wrote to Hatzenbeller in relevant part:

> While the ledger balances were a strong positive $243K last night we would like to see the available balances remain positive as well. That may occur tomorrow looking at the memo available column below if the checks coming through today are light. Also if you are not going to be depositing large checks from Prairie Mountain Bank the float (difference between ledger and available balances) will reduce significantly.
> See Affidavit of Jerry Hall and Exhibit 2 to the Amended Complaint.

On July 6, 2012, FIB knew that Hatzenbeller was continuing with his check kiting scheme. See Affidavit of Jerry Hall and Exhibit 3 to the Amended Complaint. On July 6, 2012, Ted Lewis, FIB's Vice President of Commercial Lending for Great Falls again raised his concerns regarding overdrafts with the members of Shoot the Moon, writing in part:

> Last July when we met to modify many of Shoot the Moon's loans I discussed the bank's ongoing concerns regarding the companies' working capital position.

> I mentioned that the checking accounts held at First Interstate Bank often times carried significant negative balances during the business day (referred to as daylight overdrafts) which are covered at the end of the business day with checks drawn on other financial institutions. The deposited checks take a day or so to collect through the Federal Reserve System which leaves the company's accounts with negative collected balances on a regular basis.

See Affidavit of Jerry Hall and Exhibit 3 to the Amended Complaint.

It became clear that FIB was working in concert with Prairie Mountain Bank and Hatzenbeller in the check floating scheme. See Affidavit of Jerry Hall and Exhibit 4 to the Amended Complaint. Instead of taking action to stop Hatzenbeller's fraudulent scheme, FIB worked with Hatzenbeller and took steps to protect itself from financial loss should the kiting scheme stop while significant checks had been drawn on FIB accounts. See Affidavit of Jerry Hall and Exhibit 4 to the Amended Complaint. To protect itself, FIB implemented a policy in which it would only allow Hatzenbeller to deposit checks from other financial institutions into FIB accounts but would not allow Hatzenbeller to write checks on those accounts to any Shoot the Moon-affiliated company or other financial institution. See Affidavit of Jerry Hall and Exhibit 4 to the Amended Complaint.

The policy that FIB implemented to protect itself was communicated by Ted Lewis, FIB's Vice President of Commercial Lending for Great Falls in a July 13, 2012, email between Lewis and Hatzenbeller. The email provided in relevant part:

> First Interstate Bank has agreed to your request to continue allowing checks drawn on Shoot the Moon and affiliated company accounts at other financial institutions to be deposited in First Interstate accounts provided that the companies permanently cease writing checks drawn on any First Interstate Bank accounts to Shoot the Moon and affiliated companies for deposit at other institutions.

See Affidavit of Jerry Hall and Exhibit 4 to the Amended Complaint.

Hatzenbeller continued the check kiting scheme, which raised the concerns of FIB's own Security Department. On August 15, 2013, Lewis wrote to Hatzenbeller, in relevant part:

> [W]e received the attached analysis of checking account activity from our Security Department today and it appears that checks are once again being written on STM's FIB accounts and being deposited at Prairie Mountain Bank. Is our analysis incorrect, or have STM checks drawn on FIB again been deposited on STM accounts at Prairie Mountain? Please respond with an explanation and if the activity did occur, and if so please cease this activity immediately and resume compliance with our previous agreement.

See Affidavit of Jerry Hall and Exhibit 5 to the Amended Complaint.

In an attempt to further protect itself from the risk of loss from the collapse of the check kiting scheme, FIB implemented additional restrictions on Hatzenbeller's use of accounts located at FIB. See Affidavit of Jerry Hall and Exhibit 6 to the Amended Complaint. The additional restrictions that were implemented by FIB only protected FIB's financial interests, while leaving other financial institutions and Plaintiffs exposed to significant financial harm. See Affidavit of Jerry Hall and Exhibit 6 to the Amended Complaint.

On October 2, 2013, Lewis wrote to Conner, as well as the other members, to communicate FIB's continued concerns and the implementation of additional restrictions. The email provides in relevant part:

> During a recent review of Shoot the Moon's accounts it was noted that the deposit accounts are showing higher levels of uncollected funds and that checks are being written to owners for deposit at other financial institutions. …

> Also, because of our continued concerns with the high levels of uncollected funds in the companies' deposit accounts we will begin placing holds on deposited items to the accounts that are drawn on related parties' accounts at other financial institutions. The availability of funds on checks deposited may be delayed as permitted by law until we can verify that the checks have cleared the account on which they are drawn.
>
> If we feel it necessary, we reserve the right to disallow withdrawals for a longer period of time on any particular item. We will notify you if we do this, and tell you when you will be able to withdraw the funds at the time of deposit.

See Affidavit of Jerry Hall and Exhibit 6 to the Amended Complaint.

The reasoning for restrictions implemented by FIB was explained in a February 13, 2013 email from Ted Lewis, FIB's Vice President of Commercial Lending for Great Falls to Hatzenbeller, stating in relevant part:

> The intent is to stop the potential for checks related to STM that are drawn on FIB that could, in turn fund other bank's checks, that are then deposited back into FIB accounts.

See Affidavit of Jerry Hall and Exhibit 7 to the Amended Complaint.

More than four years after first having knowledge of Hatzenbeller's check kiting scheme, FIB continued to allow Hatzenbeller to kite checks at FIB without taking any action to stop it. See Affidavit of Jerry Hall and Exhibit 7 to the Amended Complaint.

On September 22, 2014, Ted Lewis, FIB's Vice President of Commercial Lending for Great Falls sent an email confirming that FIB was aware of and participating in Hatzenbellers ongoing check kiting scheme. See Affidavit of Jerry Hall and Exhibit 8 to the Amended Complaint. On September 22, 2014, Lewis wrote to

Hatzenbeller in relevant part:

> The overdrafts are very high again at $790k. This has to get fixed, any word on the check? I know that you are in Helena but please send me some confirmation or documentation that the funds are on the way so that I can justify paying the overdrafts again.

See Affidavit of Jerry Hall and Exhibit 8 to the Amended Complaint. In addition to having actual knowledge of Hatzenbeller's illegal activities, FIB actively and intentionally participated in aiding and abetting Hatzenbeller carry out the fraudulent scheme. See Affidavit of Jerry Hall and Exhibit 9 to the Amended Complaint.

When FIB's internal controls detected red flags of fraudulent activity, FIB's officers misled FIB auditors with false assurances the officers characterized as "bs". FIB officers provided instruction and guidance directly to Hatzenbeller on how to avoid detection as evidenced in a February 9, 2012 email from Lewis to Hatzenbeller. The email provides in part:

> I just finished my first round of examiner interrogations on Shoot the Moon. They noted the large daylight overdrafts and I said that Ken always covers them, and that you watch over the accounts balance late into the night. <u>Not sure how my bs is working, we will see on Friday when they leave</u>. Thank you for keeping the payments within the 10 day grace period!!! It is huge for us with these boys breathing on the rampage.

See Affidavit of Jerry Hall and Exhibit 9 to the Amended Complaint.

FIB's officers knew that Hatzenbeller's failure to deposit even a single check could cause the fraudulent scheme to unravel. To ensure that the check kiting scheme did not collapse, FIB's officers and employees sent constant reminders to Hatzenbeller of the amount of the overdrafts that needed to be covered. See Affidavit of Jerry Hall and

Exhibits 8,9,10 and 11 to the Amended Complaint.

In a May 12, 2014 email to Hatzenbeller, Lewis sent a reminder to Hatzenbeller that he needed to cover the unlawful float to avoid detection. Lewis sent the following email:

> I am off today but need to get your overdrafts covered by 9:45 so items to Prairie Mountain won't get returned. I believe the amounts are $43k in one account and $64k in another after this mornings (sic) presentments. Please confirm these amounts and your plan to cover the items with Kevin Johnson[.]

See Affidavit of Jerry Hall and Exhibit 10 to the Amended Complaint.

On July 21, 2014, Lewis' concerns that a missed payment would lead to the collapse of the fraudulent scheme led him to write to Hazenbeller:

> Just a heads up, Kevin Johnson is on vacation this week and I will be off until next Monday starting Tuesday afternoon. This may pose a problem processing overdrafts if they are not covered today as promised. Please let me know if there are any problems funding the last loans as soon as possible.

See Affidavit of Jerry Hall and Exhibit 11 to the Amended Complaint.

The first indication that FIB was engaged in a conspiracy with FIB concerning unlawfully floating checks was August 23, 2010. See Affidavit of Jerry Hall and Exhibit 1 to the Amended Complaint. The conspiracy between FIB, Prairie Mountain Bank and Hatzenbeller was in progress at the time the HALLS made their first loan to Hatzenbeller's STM on October 18, 2013, which was deposited into an STM account at Prairie Mountain Bank. See Affidavit of Jerry Hall.

The HALLS first learned of the conspiracy between Hatzenbeller, FIB and Prairie Mountain Bank on November 13, 2021, when they received and read a copy of the emails which are attached to the Amended Complaint as Exhibits 1-12. The HALLS were never made aware if FIB ever withdrew from the conspiracy with Hatzenbeller and Prairie Mountain Bank. See Affidavit of Jerry Hall. There is no evidence that FIB withdrew from the conspiracy prior to the HALLS last investment with Hatzenbeller on September 17, 2015. See Affidavit of Jerry Hall.

The HALLS Amended Complaint seeks damages of unjust enrichment and economic losses due to FIB's conduct in the conspiracy and the direct claims of negligence and Breach of the Implied Covenant of good faith and fair Dealing and Bad Faith not based upon any theory involving the deepening insolvency of the bankrupt estate. See Affidavit of Jerry Hall and the Amended Complaint.

FIB, is a Montanan banking corporation, with its principal place of business located in Billings, Montanan. FIB is a publically traded corporation and was at all times pertinent herein doing business in Great Falls, Cascade County, Montana. Admitted by FIB in its Answer to Amended Complaint ¶ 2.

Kenneth Hatzenbeller was the managing member of Shoot the Moon III, LLC and the other 19 other entities he created between 2006 to 2015 for the purpose of acquiring and operating restaurants in Montana, Washington, and Idaho. The restaurants included Chili's Bar & Grills, On the Borders, and Sonic Drive-Ins, as well as several independent restaurants. Admitted by FIB in its Answer to Amended Complaint ¶ 4. Hatzenbeller and some Shoot the Moon entities banked with FIB for a period of time. Admitted by FIB in its Answer to Amended

Complaint ¶ 5.

The HALLS began banking with Mountain West Bank on October 19, 2001. Admitted by FIB in its Answer to Amended Complaint ¶ 6. The HALLS Mountain West bank accounts were converted to FIB on October 17, 2014 upon FIB's merger with Mountain West Bank. Admitted by FIB in its Answer to Amended Complaint ¶ 6 and 7.

FIB provided significant financing to Hatzenbeller through his different entities. The loans provided by FIB included the following:

1. A May 3, 2006 loan of $1,875,000.00 (Loan # 12050);

2. A September 29, 2006 loan of $300,000.00 (Loan # 12285);

3. A March 27, 2007 loan of $1,220,000.00 (Loan # 12665);

4. A June 23, 2008 loan of $6,812,500.00 (Loan # 13715);

5. A July 30, 2008 loan of $5,380,000.00 (Loan # 13780); and

6. A February 8, 2010 loan of $329,255.39. (Loan # 14465).

Admitted by FIB in its Answer to Amended Complaint ¶ 9.

Hatzenbeller's business entities merged into the single entity, Shoot the Moon, LLC, and filed for Chapter 11 bankruptcy in 2015. Admitted by FIB in its Answer to Amended Complaint ¶ 15. In 2017, Hatzenbeller was sentenced to 30 months in federal prison for bank fraud. Admitted by FIB in its Answer to Amended Complaint ¶ 15. At the time shoot the moon filed bankruptcy FIB was owed approximately $13,259,528.03. See FIB Answer to Amended Complaint ¶ 11 and 35.

## 2. The allegations in the Amended Complaint

The HALLS Amended Complaint asserts state law claims against FIB including Counts (3) Civil and Criminal Conspiracy; (4) Negligence-Professional Negligence-Banking Malpractice; (5) Aiding and Abetting Fraud; (6) Unjust Enrichment; (7) Breach of the Implied Covenant of Good Faith and Fair Dealing. As evidenced in their writings (exhibits 1-12 Amended Complaint), in 2010 the president and vice president of FIB entered into a conspiracy with Ken Hatzenbeller of STM and Prairie Mountain Bank.

The Montana Supreme Court has held:

> A common law conspiracy occurs in Montana when a combination of two or more persons who, by some concerted action, intend to accomplish some unlawful object for the purpose of harming another which results in damage. We also have established that it is not the conspiracy itself, but the torts committed or the wrong done in the furtherance of the conspiracy that gave rise to a conspiracy claims.

*Jones v. Montana University Systems,* (2007) 337 Mont. 1, ¶ 44. In this case, employees of Prairie Mountain bank, the president and vice president of FIB and Hatzenbeller, the manager of the STM entities worked together to facilitate and hide Hatzenbeller's illegal check kiting which is the conspiracies unlawful object. The purpose of the conspiracy was to give Hatzenbeller time to defraud investors like the HALLS and convince them to invest in the failing STM enterprise. Through the conspiracy, Hatzenbeller and FIB were able to delay STM's collapse and FIB was enriched with the injection of the HALLS and other investors money. The resulting economic loss to the HALLS is the damage that resulted from the conspiracy.

The conspiracy involved the Prairie Mountain Bank and FIB working together to

encourage, facilitate and conceal Hatzenbeller's unlawful check kiting scheme. During the five plus years of the conspiracy, FIB aided and abetted Hatzenbeller in carrying out his fraudulent scheme and actively concealed the scheme from internal and external regulators. Evidence of the conspiracy is found in the in FIB emails to Hatzenbeller, attached to the Amended Complaint.

Hatzenbeller benefitted from the conspiracy which helped delay the collapse of STM by at least 5 years. FIB was enriched by the $1,100,000 that the HALLS' invested with Hatzenbeller. Each of HALLS 18 payments to Hatzenbeller were deposited into STM accounts at co-conspirator, Prairie Mountain Bank. See Affidavit of Jerry Hall. Hatzenbeller used the HALLS' money deposited at Prairie Mountain bank to pay obligations to FIB. *See* Emails attached to the Amended Complaint. As a result of the conspiracy, FIB was unjustly enriched $1,100,000. FIB would not have been enriched by $1,100,000 if not for its participation in the conspiracy.

In evaluating the HALLS' claims it is important to understand that it is not the conspiracy which gives rise to a right of action, but the torts which may be committed in furtherance of the conspiracy. Prosser, Law of torts, 4th Ed., p. 293. The gist of the action is not the conspiracy charged, but the tort working damage to the plaintiff. It is only where means are employed, or purposes are accomplished, which are themselves tortious, that the conspirators who have not acted but have promoted the act will be held liable. *Id.*

The torts committed in the furtherance of the conspiracy include aiding an abetting fraud, negligence and unjust enrichment. By engaging in a conspiracy to unlawfully float checks for its economic benefit, FIB breached its duty to the HALLS to operate in a commercially reasonable manner, to follow prudent and sound banking practices. FIB is liable for its want or ordinary care

pursuant to §27-1-701, MCA. See also *First National Bank v. Twombly,* 689 P.2d 1226, 1230 (1984).

Hatzenbeller defrauded the HALLS by lying to them that the investments were safe and promising a good return on the investment. See Affidavit of Jerry Hall. Hatzenbeller used his ongoing banking relationship with co-conspirators FIB and Prairie Mountain Bank to demonstrate legitimacy and help facilitate the fraud. See Affidavit of Jerry Hall. A tort working damage to the HALLS was Hatzenbeller's fraud. FIB promoted the defrauding of the HALLS through the conspiracy. The purpose accomplished by the conspiracy is the defrauding of the HALLS for FIB's economic benefit. It is no defense to FIB that it did not directly defraud the HALLS.

FIB conspired with Hatzenbeller and Prairie Mountain Bank to unlawfully float checks for at least 5 years. FIB benefitted from the conspiracy by the influx of new money that Hatzenbeller was able to obtain by defrauding investors. FIB had been encouraging, facilitating and concealing Hatzenbeller's unlawful check floats for about 3 years prior to the HALLS first loan to Hazenbeller. As a result of the conspiracy, FIB received $1,100,000 from HALLS that they would not have received if Hatzenbeller's check kiting scheme had been stopped after it was discovered by FIB.

**A. Under the Wagoner Rule, the Trustee did not have standing to sue its co-conspirator FIB and therefore could not release any direct of derivative claims against FIB**.

Standing is jurisdictional under Article III of the United States Constitution, it is a threshold issue in all cases since putative plaintiff's lacking standing are not entitled to have their claims litigated in federal court. *Shearson Lehman Hutton, Inc. Wagoner,* 994 F.2d 114, 117 (2nd

Page 14 of  19

2:22-ap-02009-WLH    Doc#: 36    Filed: 02/21/23    Page 14 of 19

Cir 1991)(other citations omitted). It is well settled that a bankruptcy trustee has no standing generally to sue third parties on behalf of the estate's creditors, but may only assert claims held by the bankrupt corporation. *Id.* At 118.

When a bankrupt corporation has joined with a third party in defrauding its creditors, the trustee cannot recover against the third party for the damage to the creditors. *Wagoner* at 118. Montana recognizes the related doctrine of *in pari delicto* - "between those who are equally in the right or equally in the wrong the law does not interpose." § 1-3-215, MCA. Under Montana law the *in pari delicto* doctrine is based upon the premise that there is no recourse between wrongdoers. *Patten v. Raddatz,* 895 P.2d 633, 635 (Mont 1995).

In the Amended Complaint, the HALLS allege that Hatzenbeller, the managing member of STM, entered into a conspiracy with FIB. Although FIB knew that Hatzenbeller had insufficient funds to cover the checks he was depositing, FIB encouraged, facilitated and concealed Hatzenbeller's check kiting scheme. In the scheme, Hatzenbeller was allowed to write checks on Prairie Mountain Bank accounts with non-existent funds and deposit the checks at FIB taking unlawful advantage of float (or delay) between a check deposited and clearing of the check at Prairie Mountain bank. In some instances money obtained frm defrauding the HALLS would later cover the checks to FIB.

Hatzenbeller's unlawful conduct in the furtherance of the conspiracy is imputed to the bankrupt entity STM through agency principals. *Wright v. BankAmerica Corp.*, 219 F.3d 79, 86 (1985). The unlawful check floating by the conspirators allowed STM to operate many years longer than would have been possible and enriched FIB by money gained by defrauding the

Page 15 of 19

2:22-ap-02009-WLH Doc#: 36 Filed: 02/21/23 Page 15 of 19

HALLS. When a bankrupt corporation (STM) has joined with a third party (FIB) in defrauding creditors (the HALLS), the trustee cannot recover against the third party for damage to the creditors. *See Wagoner* at 118.

It is well settled that the bankruptcy trustee has no standing to sue third parties on behalf of the estate's creditors, but may only assert claims held by the bankrupt corporation itself. *Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416, 429 (1972). Under the Wagner rule a claim against a third party for defrauding the corporation with the assistance of management belongs to the creditors rather than the guilty party. *Wagoner* at 120. The trustee in the STM bankruptcy had no direct or derivative claims against FIB because the trustee lacked standing to bring the claims. It is axiomatic that the trustee could not release direct or derivative claims that he did not have. The 2016 Release DOC # 808 filed in the Shoot the Moon, LLC bankruptcy (15-bk-60979) does not bar the HALLS' state law claims against FIB as a matter of law.

**B. The HALLS have plead direct claims against FIB.**

The HALLS Amended Complaint asserts direct state law claims against FIB, for conduct of FIB that caused the HALLS damage. As a result of FIB conspiring with Hatzenbeller to unlawfully float checks, Hatzenbeller was able to defraud the HALLS 18 times over a two year period. The $1,100,000 that the HALLS' invested with Hatzenbeller were deposited in co-conspirator Prairie Mountain Bank and then used to cover checks deposited at FIB. FIB was enriched by the $1,100,000 that the HALLS' invested with Hatzenbeller during the conspiracy.

FIB incorrectly argues that the HALLS are seeking damages from FIB based upon the "deepening insolvency" of STM. See First Interstate Bank's Memorandum in Support of Motion

for Summary Judgment, page 18. FIB takes this position because derivative third party claims involve claims against the third party for injury to the bankrupt estate. Without this connection FIB's derivative argument fails. A plain reading of the Amended Complaint makes it clear that the HALLS claims against FIB are distinct individual claims arising out of their own direct loss through the enrichment of FIB. The connection to STM is that it's managing partner, Hatzenbeller, entered into a conspiracy with FIB that unlawfully benefitted FIB at the HALLS expense. The STM estate was not diminished by the HALLS investments in it.

The HALLS in their Amended Complaint seek damages from FIB based upon unjust enrichment and direct economic damages based upon conspiracy, negligence, aiding a abetting fraud and breach of the implied covenant of good faith and fair dealing. None of the HALLS claims seek redress for harm done to the bankrupt estate or seek damages that are general to all creditors. It is of no legal consequence to the HALLS claims that the result of the conspiracy also may have caused harm to the bankrupt estate. Where an investor claims a particularized injury, that individual can pursue a separate action even if the corporation suffers an injury from the same alleged wrongful conduct. *Lipton v. News Int'l, Plc*, 514 A.2d 1075, 1079 (Del. 1986).

A direct action such as the HALLS against FIB can be pursued where as here, the alleged conduct breaches a separate duty owed to the shareholder, or where the conduct causes the investor to suffer an injury distinct to that suffered by the corporation. See *Cowen v. Bresler*, 741 F.2d 410,415 (D.D.Cir. 1984). FIB is directly liable to the HALLS through the conspiracy with Hatzenbeller. The particularized injury or direct loss sustained by the HALLS is the result of the torts committed in the furtherance of the conspiracy.

FIB's participation in the conspiracy and promotion of Hatzenbeller's fraud on the HALLS gives rise to FIB's direct liability to the HALLS. This direct liability to the HALLS is also found in the HALLS Amended Complaint Count V - Aiding and Abetting Fraud. A defendant may be liable for civil aiding and abetting, even if the defendant owed no duty at all to the plaintiff. *See* Restatement (SECOND) Of Torts 876.

Under Montana law, each person is responsible not only for the results of the person's willful acts but also for an injury occasioned to another by the person's want of ordinary care or skill in the management of the person's property or person except so far as the person has willfully or by want of ordinary care brought the injury upon the person. 27-1-701, MCA. By joining the conspiracy with Hatzenbeller, and aiding and abetting fraud that targeted the HALLS, FIB was negligent in its banking practices and the HALLS suffered an economic loss as a result of FIB's conduct.

The HALLS have a banking relationship with FIB as customers of the bank. Banks owe their customers an obligation to deal with them fairly and in good faith. *First National Bank v. Twombly,* 689 P.2d 1226, 1230 (1984). Montana statutory law includes an implied covenant of good faith and fair dealing. The conduct required by the implied covenant of good faith and fair dealing is honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade. 28-1-211, MCA.

As alleged in the Amended Complaint, FIB entered into a conspiracy with Hatzenbeller to kite checks, delaying the demise of STM in order to funnel new investor money to FIB. FIB co-conspirator, Hatzenbeller, targeted the HALLS who were FIB customers as victims of his fraud.

There is substantial evidence that FIB breached the implied covenant of good faith and fair dealing.

The HALLS chose to file their case against FIB in their local Cascade County District Court because they believe that it is important that a Cascade County jury hear their state law claims concerning conduct of Cascade County citizens working for FIB. None of the HALLS' claims belong to the Shoot the Moon Estate or the STM Liquidating Trust. Further, the HALLS did not assign any claim or causes of action against FIB to the trustee or the estate. The trustee can assert claims only if they belong to the estate. 11 USC 1123(b)(3); See *Caplin* and *Picard v. J.P.Morgan Chase and Co.,* 460 B.R. 84, 91-94 (S.D.N.Y. 2011). The trustee, through the 2016 release, could not relinquish or concede the HALLS' claims against FIB because the trustee could not release claims that it had no authority, no standing, to assert in the first instance.

WHEREFORE, the HALLS respectfully request that the Court Grant Declaratory Judgement determining as a matter of law that the 2016 Release DOC # 808 filed in the Shoot the Moon, LLC bankruptcy (15-bk-60979) does not bar the HALLS' state law claims against FIB as a matter of law and Deny FIB's Motion for Summary Judgment.

DATED this 21st day of February, 2023.

Tarum Law Office P.C.

/s/ Randy L. Tarum

Randy Tarum

CERTIFICATE OF MAILING

I hereby certify under penalty of perjury that the foregoing was duly served, by ECF on Jenny Jourdonnais and Sheila R. Schwager, counsel for FIB.

DATED this 21st day of February, 2023.

/s/ *Randy L. Tarum*